UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

HUMANA, INC.,                                                                Plaintiff/Counter Defendant,

v.                                                   Civil Action No. 3:13-cv-759-DJH-RSE

CAVE CONSULTING GROUP, INC.,                         Defendant/Counter Claimant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This case arises out of a dispute between Humana and Cave Consulting Group (CCG) over materials that Humana did not destroy after it terminated its software license with CCG. The parties have filed cross motions for summary judgment. (Docket Nos. 103, 108/109)[1] Because the parties' contract is ambiguous and the extrinsic evidence does not clearly support either side's position, the Court will deny CCG's motion for summary judgment, grant in part and deny in part Humana's motion for summary judgment, and refer the matter to a magistrate judge for a pretrial status conference.

I.      BACKGROUND

The facts underlying this case are largely undisputed. In April 2003, Humana contracted with CCG for CCG's consulting services. (D.N. 106, PageID # 1145) Approximately six months later, the parties entered into the Marketbasket System License Agreement (MSLA), which allowed Humana the use of CCG's Marketbasket System, computer software for measuring physician efficiency. Humana paid monthly licensing fees under the MSLA and

---

[1] Humana filed two versions of its motion, one under seal (D.N. 109) and one redacted (D.N. 108). Most of the parties' summary-judgment briefs were filed under seal. (*See* D.N. 105; D.N. 109; D.N. 116; D.N. 119; D.N. 125) The Court will enter a separate order addressing whether these and other documents filed under seal pursuant to the parties' agreed protective order (D.N. 29) may remain sealed in light of the Sixth Circuit's holding in *Rudd Equipment Co. v. John Deere Construction & Forestry Co.*, 834 F.3d 589 (6th Cir. 2016).

1

renewed the agreement through December 31, 2012; those renewals, as well as modifications to the MSLA, are reflected in Amendments 1 through 4. (*See* D.N. 107-3, PageID # 1403-13) After notifying CCG of its intent to terminate the agreement, Humana certified to CCG on January 11, 2013, that it had destroyed all of CCG's confidential information as required by the MSLA, and it attached a spreadsheet listing the destroyed files. (D.N. 106-1, PageID # 1161) Nevertheless, CCG continued to bill Humana, arguing that Humana was obligated to destroy all data generated by the Marketbasket System, which CCG believes are "Interface Reports" under the MSLA. (D.N. 106, PageID # 1158; *see generally* D.N. 105)

Humana does not deny that it retained the data in question but maintains that the MSLA did not require destruction of the data it kept. It filed this action seeking a declaratory judgment that it is not liable for any further payments to CCG under the parties' agreements. (D.N. 1, PageID # 5-6) CCG counterclaimed, alleging breach of contract, conversion, and unjust enrichment and seeking specific performance of the MSLA. (D.N. 18, PageID # 62-68) The counterclaim asserts that "[a]fter expiration of the MSLA and contrary to the surviving terms of the MSLA, Humana retained, and continued to use, CCG's Intellectual Property, including, but not limited to, Interface Reports and Practitioner Efficiency Measurement Reports." (*Id.*, PageID # 64)

During discovery, Humana moved to compel responses to requests for production of documents it believed would shed light on the intended meaning of the term "Interface Reports." (D.N. 72) The magistrate judge viewed Humana's request as an impermissible attempt to create an ambiguity in the MSLA through extrinsic evidence, and he denied the motion to the extent it sought discovery of documents unrelated to CCG's agreement with Humana. (*See* D.N. 87, PageID # 1040-43 & n.15) The Court overruled Humana's objection to that ruling, agreeing

with Magistrate Judge Whalin that the information Humana sought "was 'not potentially relevant.'" (D.N. 99, PageID # 1089)

The parties each seek summary judgment on the issue of whether Humana breached the MSLA. They also dispute whether CCG has suffered damages or is entitled to recover its attorney fees. (D.N. 103; D.N. 108) Humana additionally seeks summary judgment as to CCG's counterclaims of conversion and unjust enrichment (D.N. 108, PageID # 2418-20) and moves to strike CCG's reply in support of its summary-judgment motion, which exceeded the page limit set by local rule. (D.N. 126) CCG has now moved for leave to file excess pages. (D.N. 127) All of these motions are fully briefed, and the Court has heard oral argument on the motions for summary judgment. (D.N. 146)

## II. ANALYSIS

At the heart of the parties' disagreement are their differing characterizations of the data in question. According to CCG, the files retained by Humana constitute "Interface Reports," which, under the MSLA, are "Confidential Information" that must be destroyed. Humana, however, believes that the files comprise the "Client Database" and thus belong to Humana; it claims never to have used the Interface Report component of the Marketbasket System. Therefore, to resolve the motions for summary judgment, the Court must interpret the MSLA.

### A. Summary Judgment Standard

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). "[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (alteration in original) (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001)).

### B. Choice of Law

As an initial matter, the Court must determine what state's law applies. The MSLA provides that it is to be construed in accordance with the laws of Missouri. (D.N. 109-18, PageID # 3340) However, the Court must apply Kentucky's choice-of-law rules, *see Performance Contracting, Inc. v. Dynasteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014), and "Kentucky courts have an extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws." *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (citations omitted). Because "Kentucky courts will not automatically honor a choice-of-law provision, to the exclusion of all other considerations," *id.* (quoting *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000)), the MSLA's designation of Missouri law is not dispositive. Rather, if Kentucky has the "most significant relationship to" the MSLA and the parties, the Court must apply Kentucky law. *Id.* (quoting *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566-67 (Ky. 2012)).

Humana asserts that Kentucky has the most significant relationship to this case because Humana's principal place of business is in Kentucky; Humana's negotiation and execution of the MSLA occurred in Kentucky; the MSLA specifically authorized use of the Marketbasket System in Louisville, Kentucky; and the stated purpose of the MSLA was to facilitate data-processing by Humana at its Kentucky headquarters. (D.N. 109, PageID # 2489-90 (citing various MSLA provisions)) CCG does not dispute these points; instead, it merely asserts that Missouri law should apply because the MSLA says so.[2] (D.N. 105, PageID # 1125, 1128; *see generally* D.N. 116) But "Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky." *Osborn*, 865 F.3d at 444 (citing *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 570 (6th Cir. 2016)). Based on the facts outlined by Humana, Kentucky has the most significant relationship to the parties' dispute. The Court will therefore apply Kentucky law.

### C.    Contract Interpretation

Under Kentucky law, contract interpretation is a legal issue for the Court, with the parties' intent to be determined from the four corners of the contract if possible. *VIBO Corp. v. Conway*, 669 F.3d 675, 688 (6th Cir. 2012) (citations omitted); *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). If, however, a contractual term is ambiguous—that is, "if a reasonable person would find it susceptible to different or inconsistent interpretations," *Big Sandy Co. v. EQT Gathering, LLC*, 545 S.W.3d 842, 845 (Ky. 2018)—then the Court may attempt to discern the parties' intentions through extrinsic evidence. *Clark v. Hectus & Strause PLLC*, 345 S.W.3d 857, 860 (Ky. Ct. App. 2011) (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)). Ultimately, "if the writing is ambiguous, the

---

[2] The only apparent connection to Missouri is that some of CCG's counsel are located there.

factual question of what the parties intended is for the jury to decide." *Id.* at 859 (quoting *Equitania*, 191 S.W.3d at 556). Thus, "[c]ontract language can be interpreted by the court on summary judgment if the contract's terms are clear and unambiguous or, if the contract language is ambiguous, the extrinsic evidence supports only one of the conflicting interpretations, notwithstanding the ambiguity." *Arlington Video Prods. v. Fifth Third Bancorp*, 569 F. App'x 379, 386 (6th Cir. 2014) (citing *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004)). Here, Humana and CCG each contend that the MSLA unambiguously supports their respective positions. (*See* D.N. 105, PageID # 1128-31; D.N. 108, PageID # 2407) Neither is correct.

### 1. Relevant Provisions

For purposes of the MSLA, Humana is the "Client." (D.N. 109-18, PageID # 3327) The following definitions from the agreement are at issue:

(d) "Client Data" means medical claims and encounter information and information about medical/surgical reimbursement claims, mental health/chemical dependency claims, prescription drug reimbursement claims, and clinical laboratory services from Client's own membership that Client desires to process and create databases in-house [sic].

(e) "Client Database" means Client Data that has been processed, integrated, and organized by the Marketbasket System.™

. . . .

(g) "Confidential Information" means the Intellectual Property and information concerning either party's services, operations, business plans, processes, and financial information and other confidential information of or relating to either party and the trade secrets, proprietary and confidential all [sic] past, present and future business activities and all information related to the business of Client, its officers, directors, employees and agents, its and their clients, members and/or enrollees whether de-identified or not that may be obtained orally, in writing or from any source, as well as all information that may be obtained and or gleaned from Client or a third party[,] including Client Data, and information on Client's mainframe, LANs and workstations and all

software, middleware, firmware, licensed internal code and direct or remote access method and also including but not limited to, any information relating to the pricing, methods, processes, financial data, lists, apparatus, statistics, programs, research, development or related information of Client, its clients, members and/or enrollees concerning past, present or future business activities and/or the results of the provision of services to Client.  Confidential [I]nformation does not include: (a) information that is in the public domain prior to the disclosure or becomes part of the public domain through no wrongful act of the party receiving such information, (b) information that was i[n] lawful possession of the receiving party without a confidentiality obligation prior to the disclosure, (c) information that was independently developed by the receiving party outside the scope of this Agreement, and (d) information that was disclosed to the receiving party by a third party who was in lawful possession of the information without a confidentiality obligation.

(h)  "Derivatives" means all Intellectual Property, improvements, modifications, changes, alterations, amendments or the like, relating to the Intellectual Property.  Notwithstanding, both parties understand and agree that should Client receive results from the Marketbasket System and create other systems or data ("Client System"), such Client Systems shall not be construed as a Derivative.  Client Systems shall be the sole property of Client. . . .

. . . .

(j)  "Intellectual Property" means all of the Algorithms, Interface Reports, Models, and CCGroup's other proprietary software, source code, object code, information, methods of analysis, copyrights, trade marks, service marks, patents, inventions and trade secrets, Derivatives, Upgrades, and documentation, manuals and training materials relating to any of them, all of which is owned or licensed from CCGroup, excluding all Client Systems and it[s] documentation and/or materials.

(k)  "Interface Reports" means CCGroup's visual, graphical, written, or other presentation (whether in hard copy or machine readable form or on a computer monitor) of information generated by CCGroup's interface software.  Reports shall include Practitioner Efficiency Measurement Reports©.

. . . .

(m)  "Marketbasket System" means a physician-centric processing system, and not patient-centric, which includes the Cave Grouper™, Physician Efficiency Measurement Software, and Interface Reports. . . .

(*Id.*, PageID # 3327-29) Section 10(f) of the MSLA provides that upon termination of the agreement,

> each party shall immediately cease using the Confidential Information of the other party and shall promptly return or destroy all copies (including all backup and archival copies, as applicable) of such Confidential Information in its possession, accompanied by a certificate of an authorized representative of the applicable party confirming that the returned materials constitute all of the existing copies of any of the foregoing, and that such party has not retained any counterparts thereof.

(*Id.*, PageID # 3339)

### 2. Interface Reports

Based on the above provisions, CCG argues that the Marketbasket System's outputs are Interface Reports, which constitute Intellectual Property, which is part of the Confidential Information that Humana was obligated to destroy. (*See, e.g.*, D.N. 116, PageID # 5165-68) In CCG's view, the Court has already found that the MSLA unambiguously defines "Interface Reports." In support, it points to the following portion of Judge Whalin's ruling on the motion to compel:

> The Court's own reading of the matter suggests that the cited contract provisions appear to be reasonably clear. The term "Interface Reports" appears to include any presentation of information generated by CCG's interface software to include Practitioner Efficiency Measurement Reports. Such Interface Reports are directly included within the contractual definition of "intellectual property," which itself is included within the contractual definition of "confidential information."
>
> Confidential information is required by paragraph 10(f) of the parties' MSLA to be returned or destroyed at the expiration of the MSLA. If Humana retained any such Interface Reports or Practitioner Efficiency Measurement Reports it arguably has violated the provisions of the MSLA. While this conclusion is much debated and remains far from resolved, the contractual terms at issue hardly appear to be ambiguous, at least based upon what Humana has provided us to date. Humana has not come forward in its motion to compel with a plausible explanation of how the MSLA is facially ambiguous with respect to the cited provisions. Therefore, the Court concludes that Humana is not entitled to go

outside the four corners of the MSLA to obtain the CCG software licensing agreements of other non-parties or to obtain the Aetna materials that it seeks.

(D.N. 87, PageID # 1041) But this purported finding of unambiguity was not necessary to Judge Whalin's ruling, nor is it dispositive here. The denial of the motion to compel turned primarily on the argument Humana made—or rather, didn't make—as to why it should be permitted to take the discovery it sought: because Humana did not argue that the MSLA's definition of "Interface Reports" was ambiguous, it failed to show that extrinsic evidence concerning the term's meaning was potentially relevant and therefore discoverable. (*See id.*) In short, Judge Whalin's order has no preclusive effect at this stage of the proceedings.

Having reviewed the parties' extensive summary-judgment briefing, the Court finds that the term "Interface Reports," as used in the MSLA, is ambiguous. Although CCG insists that the files retained by Humana constitute Interface Reports, it is not clear from the MSLA what Interface Reports are, much less that they encompass the data at issue here. As defined in the MSLA, Interface Reports are "generated by CCGroup's interface software." (D.N. 109-18, PageID # 3329) But "interface software" is not a defined term, and the parties disagree as to its meaning. CCG suggests that the term is synonymous with "Marketbasket System software"; it recites the MSLA's definition of Interface Reports, then asserts:

> It is undisputed that the output files [at issue] were generated by CCG's Marketbasket System software. It is further undisputed that those output files were retained in a format that is "machine readable" or readable "on a computer monitor." Thus, there is no question that these files are "Interface Reports."

(D.N. 105, PageID # 1136 (citations omitted)) CCG cites no evidence, however, showing that the Marketbasket System software is the "interface software" referred to in the MSLA. (*See id.* (citing deposition testimony establishing that files were generated by Marketbasket System software)) And reading the two terms as equivalent would render one superfluous, a result

contrary to Kentucky law. *See JSC Terminal, LLC v. Farris*, No. 5:10-CV-00040-R, 2010 U.S. Dist. LEXIS 52481, at *8 (W.D. Ky. May 27, 2010) ("An interpretation of a contract that gives meaning to all of its provisions is favored over an interpretation that renders part of it superfluous." (citing *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986))).

Nor do other provisions of the MSLA indicate that the term "Interface Reports" refers to any and all files generated by the Marketbasket System. For example, the Recitals state:

A. Client has collected Client Data on its enrollees and desires to process this Client Data in-house for the purposes and on the terms and conditions hereinafter set forth.
B. CCGroup has developed Algorithms and proprietary software that permit it to organize data obtained from various sources into databases.
C. CCGroup has developed Interface Reports that permit users to access specific databases containing data, and to prepare Reports based on the information contained therein.
D. CCGroup wishes to license the Marketbasket System™ proprietary software to client on the terms and conditions set forth in this Agreement and Client wishes to license the Marketbasket System™ proprietary software from CCGroup on such terms and conditions.

(D.N. 109-18, PageID # 3327) Recital C suggests that Interface Reports represent a particular function of the Marketbasket System software, namely a function used to access databases and generate "Reports." (*Id.*) It thus undermines CCG's contention that the "[w]hen the term 'report' is used in the MSLA, it is used as shorthand for the term 'Interface Reports.'" (D.N. 119, PageID # 5203; *see also id.*, PageID # 5217, 5222)

The MSLA's definition of "Marketbasket System™"—"a physician-centric processing system . . . [that] includes the Cave Grouper™, Physician Efficiency Measurement Software, and Interface Reports"—likewise suggests that Interface Reports are but one facet of the Marketbasket System; that the system consists of multiple types of software; and that "Reports" and "Interface Reports" are not the same thing. (*Id.*, PageID # 3329) The definition of "Marketbasket System Manual" as "a manual that . . . defines input and output files and formats"

10

also appears to confirm that the Marketbasket System generates data other than Interface Reports (*id.*, PageID # 3329), as does the warranty section of the MSLA, which disclaims any responsibility by CCG for "[Humana's] improper use of the Marketbasket System™ or any Interface Reports *or other information generated by the Marketbasket System*." (*Id.*, PageID # 3336 (emphasis added))

Meanwhile, paragraph 4(b)(i) of the MSLA labels "information contained []in or derived []from" Interface Reports as "Report Information."[3] (*Id.*, PageID # 3332) Paragraph 4(g) also seems to support CCG's position that Interface Reports are the Marketbasket System's primary product:

> Client expressly acknowledges and agrees that Interface Reports, generated by or for Client using the Marketbasket System™ are intended only to assist Client in identifying for further investigation and appropriate action, health care providers whose practice patterns appear different from their peers. . . . Client agrees that it will conduct its own independent investigation of relevant records and circumstances prior to making decisions concerning situations that Interface Reports and Report Information target for investigation and Client will base

---

[3] Humana points to Paragraph 4(b)(i) to show that the files it retained were not confidential. That paragraph states:
> The Interface Reports and any information contained therein or derived therefrom ("Report Information") may be used and disclosed by [Humana] (a) for internal business purposes; (b) to support external practitioner feedback programs; (c) research purposes; (d) network modifications; (e) peer review publications; (f) press releases; and (g) for any other purpose, in each case consistent with the provisions of th[e MSLA].

(D.N. 109-18, PageID # 3332) If it was free to "use[] and disclose[]" Interface Reports, Humana argues, then clearly Interface Reports were not Confidential Information. (D.N. 109, PageID # 2495 (quoting MSLA at 4(b)(i))) Humana urges the Court to find that no breach of section 10(f) occurred because it would be "illogical to find that the retained data is 'CCG's Confidential Information'" subject to destruction. (D.N. 109, PageID # 2494) CCG responds that Humana's argument "fails because it is based on Humana's colloquial interpretation of the 'confidential information' term rather than the explicit language of the MSLA." (D.N. 116, PageID # 5177) On this point, CCG appears to be correct; the MSLA defines "Confidential Information" to include Intellectual Property, which in turn includes Interface Reports. (D.N. 109-18, PageID # 3328-29) The Court need not resolve this issue, however, as CCG has failed to establish that the files in question were Interface Reports.

> decisions concerning these circumstances upon the results of Client's investigation.

(*Id.*, PageID # 3333) Finally, CCG points to the parties' amendments to the MSLA, noting that Amendment 4 redefines "Marketbasket System™" as "includ[ing] the following five (5) analytic modules: Cave Grouper™, CCGroup EfficiencyCare™, CCGroup BullsEye™, CCGroup EffectivenessCare™, CCGroup MediScreen™, *and corresponding Interface Reports*." (D.N. 107-3, PageID # 1406 (emphasis added); *see also id.*, PageID # 1410 (prior similar amendment)) According to CCG, "[t]his definition is noteworthy because it clarifies that Interface Reports are generated by each module of the Marketbasket System and, importantly, that Reports are *not* generated by a separate Interface Software module, as Humana wrongly suggests in its briefing." (D.N. 119, PageID # 5204)

Yet immediately following the new definition of "Marketbasket System" is a detailed definition listing the various "Output Files" generated by the system. (D.N. 107-3, PageID # 1407, 1410-11) Each of the Output Files described has a ".tab" suffix—the same suffix as many of the files at issue in this case. (*See* D.N. 105, PageID # 1132-34 (arguing that Humana wrongfully retained .tab files generated by the Marketbasket System software)) Indeed, CCG refers to the data at issue as "output files" throughout its briefing. (*See, e.g.*, D.N. 105, PageID # 1136; D.N. 116, PageID # 5160) The relationship between Interface Reports and Output Files is unclear from the MSLA amendments. As a matter of contract interpretation, however, the Court must conclude that they are not the same thing, since under Kentucky law, a contract is to be read in a way that "giv[es] effect to all parts and every word in it if possible." *Am. Dairy Queen Corp. v. Fortune St. Research & Writing, Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010) (quoting *Newland*, 705 S.W.2d at 919). If all Output Files were Interface Reports (or vice

versa), then one of the terms would be superfluous. In sum, the language of the MSLA is ambiguous as to whether the files at issue in this case are Interface Reports.[4]

Nor does extrinsic evidence establish that the relevant files are Interface Reports. While deposition testimony by Humana's representatives makes clear that Humana did indeed retain data generated by the Marketbasket System (*see* D.N. 106, PageID # 1154-57 (quoting Ryskamp, Johnson, and Booth depositions)), CCG offers no evidence that, for example, the parties discussed what would constitute Interface Reports in their negotiations leading up to the MSLA. (*See generally id.*) Indeed, CCG relies on Humana's expert, who opined that "patan.txt" files—some of which Humana retained—are "reports" within the meaning of the MSLA. (*Id.*, PageID # 1157; *see* D.N. 107-8, PageID # 1606) As explained above, however, it is not clear from the MSLA that any "report" is also an Interface Report.

The word "interface" is of minimal help. Merriam-Webster defines "interface" as "the place at which independent and often unrelated systems meet and act on or communicate with each other" or "the means by which interaction or communication is achieved at an interface," https://www.merriam-webster.com/dictionary/interface (last visited June 14, 2018); Humana's

---

[4] CCG also relies on the original consulting agreement between the parties, which it calls "the Master Agreement." CCG argues that "[t]he Master Agreement provides that the Marketbasket System 'data outputs and reports' belonged solely to CCG"; that "[t]hose data outputs were to be marked 'Consultant Confidential Material'"; and that "[t]he MSLA complemented the intellectual property protection afforded to CCG in the Master Agreement, requiring Humana to 'immediately cease using' any 'Confidential Information' in its possession upon expiration of the MSLA, and to promptly return to CCG or destroy all copies of 'Confidential Information' in its possession." (D.N. 105, PageID # 1128) Yet the MSLA states:
>   This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all contemporaneous agreements, prior agreements, negotiations, proposals and representations, oral or written, relating to the subject matter herein or therein. No provision of this Agreement may be changed, modified, or amended except by a written agreement executed by the parties hereto.

(D.N. 109-18, PageID # 3340) In light of this merger clause, the Court will not look to the parties' prior agreement when interpreting the MSLA.

expert, Philip Greenspun, described it as the part of the CCG software that "allowed users to interactively request and receive reports." (D.N. 107-8, PageID # 1601) These definitions indicate that Interface Reports are reports deliberately generated by the user, but it remains unclear whether the term encompasses any and all data produced by the Marketbasket System.

### 3. Client Database

It is likewise not apparent that the files are part of the "Client Database," as Humana contends. (*See* D.N. 114, PageID # 3574) Under the MSLA, the Client Database consists of "Client Data that has been processed, integrated, and organized by the Marketbasket System™." (D.N. 109-18, PageID # 3327) According to Humana, the term includes the data at issue in this case, "which Humana generated by processing its Client Data through components of the Marketbasket software." (D.N. 114, PageID # 3574) And since Client Data and Client Systems belong to the Client, Humana reasons, the Client Database must also. (*See id.* & n.4; D.N. 109, PageID # 2492) But Humana's reading creates the same problem CCG's does: equating "Client Database" with "output files" renders one of the terms superfluous. (*See* D.N. 114, PageID # 3575) *See Am. Dairy Queen Corp.*, 753 F. Supp. 2d at 679; *JSC Terminal*, 2010 U.S. Dist. LEXIS 52481, at *8. Moreover, as CCG observes, the MSLA does not state that the Client Database belongs to Humana (though the term itself suggests that it does).[5] (D.N. 109-18, PageID # 3327-28)

As for extrinsic evidence regarding the meaning of "Client Database," Humana points to the depositions of CCG's President and CEO Douglas Cave and corporate representative Yuri

---

[5] CCG's other argument, that "the MSLA does not use the term Client Database to refer to all of the outputs of the Marketbasket System," is unsupported by any citations to the record. (D.N. 116, PageID # 5174 ("The term 'Client Database' is merely intended to refer to Client Data which is input into [sic] the Marketbasket System by Humana and which is 'processed' and 'organized' by the Marketbasket System but saved in an unaltered state."))

14

Alexandrian. (D.N. 114, PageID # 3574) Alexandrian testified that "the client database simply means the collection of outputs from the CCGroup Marketbasket System that have been the result of taking Humana's claims data and processing it through the system." (D.N. 114-23, PageID # 4584) This adds little to the MSLA's definition of the term. (*See* D.N. 109-18, PageID # 3327 ("'Client Database' means Client Data that has been processed, integrated, and organized by the Marketbasket System™.")) And Alexandrian gave a virtually identical definition for "interface reports," describing them as "essentially the information that's generated by running the CCGroup Marketbasket System." (D.N. 107-8, PageID # 1602 (quoting Alexandrian Dep. at 17:14-25)) Cave's testimony that the Client Database "would be the output file component of the interface reports" (D.N. 114-17, PageID # 4408) is similarly unilluminating given the lack of clarity as to what constitutes an interface report. *See supra* Part II.C.2.

Because the language of the MSLA is ambiguous and this is not a case where "the extrinsic evidence supports only one of the conflicting interpretations, notwithstanding the ambiguity," a jury must decide what the parties' intentions were and whether Humana breached the MSLA. *Arlington Video Prods.*, 569 F. App'x at 386 (citation omitted); *see Equitania*, 191 S.W.3d at 556.

### 4. Conversion and Unjust Enrichment

CCG's motion for summary judgment pertains only to its breach-of-contract counterclaim (D.N. 105, PageID # 1138), and its response to Humana's motion contains no discussion of its remaining counterclaims of unjust enrichment and conversion. (*See* D.N. 116) CCG thus appears to have abandoned these counterclaims. In any event, as Judge Whalin previously explained (D.N. 57, PageID # 520-22), conversion and unjust enrichment are not

viable causes of action where the same facts underlie a breach-of-contract claim. *See Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) ("Under Kentucky law, '[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.'" (alteration in original) (quoting *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977)); *EQT Prod. Co. v. Magnum Prod. Co.*, 266 F. Supp. 3d 961, 976 (E.D. Ky. 2017) (noting that "federal courts within the Sixth Circuit have dismissed unjust enrichment claims that were premised on the same facts underlying a breach of contract claim, relying on the . . . rule" set out in *Codell* (citations omitted)); *DuraCore Pty Ltd. v. Applied Concrete Tech., Inc.*, No. 5:13-CV-184-TBR, 2016 U.S. Dist. LEXIS 84503, at *17 (W.D. Ky. June 28, 2016) ("[A] plaintiff cannot maintain a conversion claim in addition to a breach of contract claim unless [it] can establish the existence of an independent legal duty separate and apart from the contractual obligation. In other words, a conversion claim cannot be brought where the property right alleged to have been converted arises entirely from the contractual rights." (second alteration in original) (citations and internal quotation marks omitted)); *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005) (conversion claim "does not lie [where] the property right alleged to have been converted arises entirely from the contractual rights to compensation"). CCG admitted in discovery that its claims of conversion and unjust enrichment are based on the MSLA. (*See* D.N. 108-6, PageID # 2450-51) Humana is therefore entitled to summary judgment on these counterclaims.

### 5. Damages

Humana further contends that CCG's breach-of-contract claim must fail because CCG has no evidence of damages, while CCG maintains that it should be awarded the license-renewal

fees due under the MSLA. (D.N. 109, PageID # 2502-04; D.N. 116, PageID # 5178-80) Since, as explained above, there remains a genuine dispute of material fact as to whether Humana breached the MSLA, CCG is not entitled to recovery at this time.[6]

Nor has Humana established that summary judgment is warranted in its favor with respect to damages. Humana characterizes the lost license fees as "reflective of Humana's rightful decision not to renew the MSLA," rather than flowing from the alleged breach of the parties' agreement, and thus unrecoverable. (D.N. 109, PageID # 2502) It cites *Kentucky Coca-Cola Bottling Co. v. Red Bull North America, Inc.*, No. 1:08-CV-00056-R, 2010 U.S. Dist. LEXIS 249 (W.D. Ky. Jan. 4, 2010), for the proposition that "damages for improper termination of a contract 'may not reflect loss of a contract or discontinuance of the business relationship.'" (D.N. 109, PageID # 2502 (quoting *Ky. Coca-Cola Bottling Co.*, 2010 U.S. Dist. LEXIS at *18))

In the *Coca-Cola* case, however, the alleged breach was the defendant's failure to provide sufficient notice that it was terminating the parties' agreement, and the plaintiff admitted that the damages it claimed to have suffered would have been incurred regardless of how much

---

[6] The same is true with respect to CCG's request for an award of attorney fees. (*See* D.N. 105, PageID # 1141-42) The Court notes, however, that if CCG ultimately prevails on its breach-of-contract claim, it will likely be entitled to recover those fees pursuant to paragraph 9(d) of the MSLA. (D.N. 109-18, PageID # 3338) Although Humana protests that paragraph 8 ("Limitation of Liability") precludes recovery of consequential damages, that paragraph limits the parties' liability for several broad categories of damages, whereas paragraph 9(d) specifically allows CCG to recover its legal fees in case of breach by Humana. (*See id.*, PageID # 3337-38) The latter therefore controls. *See Francis v. Armstrong Coal Reserves*, No. 4:11-CV-00077-M, 2012 U.S. Dist. LEXIS 168473, at *15 (W.D. Ky. Nov. 27, 2012) ("Under Kentucky law, courts should decline to read a contract's more general provisions to address matters that are specifically addressed in other provisions of the same contract." (citing *Newton v. N. Am. Specialty Ins. Co.*, No. 08-522-JBC, 2010 U.S. Dist. LEXIS 101137, at *8 (W.D. Ky. Sept. 23, 2010); *Briscoe v. Preferred Health Plan, Inc.*, No. 3:02CV-264-S, 2008 U.S. Dist. LEXIS 66962, at *7 (W.D. Ky. Sept. 3, 2008))).

notice the defendant gave.[7] *Id.* at *17-*18. Moreover, the Court had already found that there was insufficient evidence to support the plaintiff's breach-of-contract claim. *Id.* at *17. Here, CCG claims that it was harmed not by Humana's termination of the MSLA, but rather by Humana's failure to destroy certain files upon termination in accordance with the agreement—in other words, that Humana continued to enjoy contractual benefits after the MSLA was terminated instead of paying the required license-renewal fee. (D.N. 116, PageID # 5180) It could still prevail on this claim. Thus, *Coca-Cola Bottling Co.* is inapposite, and neither party is entitled to summary judgment on the issue of damages.

D.   **Motion to Strike and Motion for Leave to File Excess Pages**

Humana argues that the Court should strike CCG's reply in support of its motion for summary judgment because the reply exceeds the page limit set by local rule and makes arguments not raised in CCG's motion. (D.N. 126) CCG admits that its reply was too long and belatedly seeks leave to file excess pages. (D.N. 127; *see* D.N. 128, PageID # 5313) It contends that the reply was otherwise proper because it addressed issues raised in Humana's response. (D.N. 128, PageID # 5313-18)

The Court expects compliance with this district's local rules in all cases. *See* LR 7.1(d) (setting page limits for motions, responses, and replies). Nothing in CCG's reply alters the Court's conclusion regarding summary judgment, however, and thus Humana will not be prejudiced if the excess pages are allowed. The motion for leave to file excess pages will therefore be granted, and the motion to strike will be denied.

---

[7] The plaintiff also failed to file an expert report regarding its damages as ordered by the Court. *See Ky. Coca-Cola Bottling Co.*, 2010 U.S. Dist. LEXIS 249, at *17. Further, its representative admitted that some of the alleged damages represented unrecoverable "past expenses" and the rest were "pulled . . . 'out of the air.'" *Id.* at *18.

## III. CONCLUSION

"Although courts 'should construe terms so as to render none nugatory . . . ,' the task is not always that easy: Inartful drafting sometimes leaves courts with competing interpretations that *both* render other provisions of the contract superfluous or at least awkward." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 443 (6th Cir. 2007) (quoting *McCoy v. Meridian Auto. Sys.*, 390 F.3d 417, 422 (6th Cir. 2004)). In this case, neither side's interpretation of the MSLA is obviously correct. Thus, a genuine dispute of material fact remains, and summary judgment is inappropriate. *See Arlington Video Prods.*, 569 F. App'x at 386. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)	Cave Consulting Group's motion for summary judgment (D.N. 103) is **DENIED**.

(2)	Humana's motion for summary judgment (D.N. 108; D.N. 109) is **GRANTED** as to CCG's counterclaims of conversion and unjust enrichment. The motion is **DENIED** in all other respects.

(3)	Cave Consulting Group's motion for leave to file excess pages (D.N. 127) is **GRANTED**.

(4)	Humana's motion to strike (D.N. 126) is **DENIED**.

(5)	Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is **REFERRED** to Magistrate Judge Regina S. Edwards for a status conference to set a trial date and pretrial deadlines.

September 19, 2018

**David J. Hale, Judge**
**United States District Court**